CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

APR 27 2020
JULIA C. DUDLEY, CLERK
BY:  s/ H. MCDONALD
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| LINDA H.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:18-cv-00073 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:   Joel C. Hoppe |
| SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Linda H. asks this Court to review the Commissioner of Social Security's final

decision denying her application for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C.

§ 636(b)(1)(B). ECF No. 13. Having considered the administrative record, the parties' filings,

and the applicable law, I find that the Commissioner's decision is supported by substantial

evidence and should be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[2] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *Id.*

## II. Procedural History

In May 2015, Linda filed for DIB alleging that she was disabled from high blood pressure, diabetes, sleep apnea, heart attack, and stroke. *See* Administrative Record ("R.") 133, 221–24, ECF No. 10. Linda was fifty-nine, or a person of "advanced age" under the regulations, when she allegedly became disabled on April 30, 2015. R. 133; 20 C.F.R. § 404.1563(e). Disability Determination Services ("DDS"), the state agency, denied her claim initially in October 2015, R. 132–42, and upon reconsideration that December, R. 143–53. In June 2017, Linda appeared with counsel and testified at an administrative hearing before ALJ Karen Robinson. R. 101–12. A vocational expert ("VE") also testified at this hearing. R. 112–28.

ALJ Robinson issued an unfavorable decision on January 24, 2018. Linda had "the following severe impairments: hyperlipidemia, hypertension, coronary artery disease (CAD), history of stroke, diabetes, and obesity." R. 82. Linda's other medical impairments were non-severe because they were well controlled and did not require ongoing treatment. *Id.* Linda's impairments did not meet or equal the severity of any relevant Listing. R. 83 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 4.04, 9.00, 11.04). ALJ Robinson then evaluated Linda's residual functional capacity ("RFC") and found that she could do "sedentary work as defined [in the

regulation] except she [could] lift and carry up to 20 pounds occasionally and 10 pounds frequently." R. 83 (citing 20 C.F.R. § 404.1567(a)).[3] Linda could "frequently" balance and stoop and "occasionally" climb ramps and stairs, kneel, crouch and crawl, but she could not climb ladders, ropes, or scaffolds or tolerate any exposure to unprotected heights, extreme temperatures, or pulmonary irritants like dusts, gases, fumes, and odors. R. 83–84. Based on this RFC finding and the VE's testimony, ALJ Robinson concluded at step four that Linda was not disabled because she still could perform her past relevant work as a transcriptionist. R. 86–87; *see* R. 115–16, 240. In the alternative, ALJ Robinson concluded at step five that Linda could adjust to other, less demanding work (receptionist, general office clerk/appointment clerk, data entry clerk) that offered a significant number of jobs in the national economy. R. 87–88, 115–16.

Linda asked the Appeals Council to review ALJ Robinson's decision, and she submitted additional evidence for review. R. 13–75, 215–20. The Appeals Council found that the evidence dated March to May 2017 did "not show a reasonable probability that it would change the outcome of the [ALJ's] decision" and the evidence dated February 23, 2018, did "not relate to the period at issue." R. 2. The Appeals Council denied Linda's request for review, R. 1–4, thereby making ALJ Robinson's written decision "the final decision of the Commissioner" denying her DIB claim, R. 1. This appeal followed.

---

[3] "Sedentary" work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). A person who can meet these very modest lifting requirements can perform "the full range of sedentary work" if he or she can sit for about six hours and stand/walk for about two hours in an eight-hour workday. *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); *see* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). "Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations," but very rarely are they presumed disabled. SSR 96-9p, 1996 WL 374185, at *3. ALJ Robinson's RFC finding is also consistent with a reduced range of "light work" insofar as it allows Linda to lift and carry up to twenty pounds, 20 C.F.R. § 404.1567(b), but limits her standing/walking to not "more than [an] occasional basis," R. 85. *See Kevin D. v. Berryhill*, No. 4:17cv68, 2018 WL 7075299, at *13–14 & n.9 (W.D. Va. Dec. 26, 2018), *adopted by* 2019 WL 254673 (W.D. Va. Jan. 17, 2019). "'Occasional[]' means occurring from very little up to one-third of the time" and "should generally total no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).

### III. Discussion

Linda argues that the ALJ's RFC finding failed to account for her limited ability to finger, her left-sided weakness, and her limited ability to maintain concentration, persistence, and pace. Pl.'s Br. 4–11, ECF No. 15. She also argues that the ALJ erred in discounting the opinions of nurse practitioner Robin Harmer and consultative examiner Michael Quinn, D.O. *See id.* at 11–14. Her arguments are not persuasive.

A.    *Summary*

1.    *Treatment Notes*

Linda has a history of diabetes, hypertension, coronary artery disease, cerebrovascular accident ("stroke"), sleep apnea, and hyperlipidemia. In March 2012, Linda had a stroke. *See* R. 512. During occupational therapy, she started experiencing left shoulder pain and exhibited reduced range of motion and weakness in her left arm. R. 506, 508–10, 512–13. Linda returned to work as a medical transcriptionist after her stroke. *See* R. 229, 239, 295. A year later, she complained of fatigue and had "very mild residual left-sided weakness." R. 300–01. On exam, her finger-to-nose test was normal, and her sensation was intact, but she exhibited a limping gait and reduced strength (4+/5) in her left extremities. R. 302. Her stroke and hypertension were stable and controlled by medication. *Id.*

In April 2014, Linda reported dizziness and increased stress but denied chest pain. R. 295–96. Her mental and physical examinations were normal, including no loss of strength, no instability, no sensory deficit, no edema, full range of motion, and normal gait and station. R. 297. On September 12, her mental and physical examinations were normal except for trace edema in her feet. R. 305–06. Two days later, however, she was admitted to the hospital with acute aspiration pneumonia and pulmonary edema after choking on a strawberry. R. 339, 343,

413. She reported occasional trouble swallowing since her stroke. R. 331. On exam, she was hypoxic with oxygen saturation at eighty-one percent and her chest X-ray showed infiltrate in the left lung suggestive of mild interstitial edema. R. 343, 426. She had a normal gait, full range of motion, and no muscle weakness. R. 410. She reported chest soreness and had elevated troponin levels. R. 331. Her electrocardiogram ("EKG") did "not reveal any acute myocardial injury," *id.*, but did show "grade 1 diastolic dysfunction," R. 340. Her myocardial perfusion imaging stress test was abnormal and consistent with myocardial ischemia, but showed normal left ventricular ejection fraction. R. 338. After four days, Linda was discharged in stable condition and scheduled for a heart catheterization for "life-style limiting angina." R. 340, 395–96. Habib Bassil, M.D., successfully placed five stents, R. 395–96, referred Linda to cardiac rehabilitation, R. 364, and released her to work at the end of October, R. 361.

Linda's mental and physical examinations remained normal throughout 2014 with no loss of strength, no instability, no sensory deficit, full range of motion in all extremities, normal gait and station, and occasional mild pedal edema. R. 289, 291, 319, 323–24, 352–53. Linda denied chest pain and said she felt "'good'" and her fatigue had "improved greatly" after the stents were placed. R. 321, 356. She continued cardiac rehabilitation, R. 317, and her cardiovascular status was stable in November. R. 317, 353. Linda began treatment with James Witko, M.D., and reported dyspnea on exertion, impaired exercise tolerance, fatigue, and daytime sleepiness. R. 290, 351, 356. She was diagnosed with chronic obstructive sleep apnea, not controlled, and prescribed a continuous positive airway pressure ("CPAP") machine. R. 289–90, 358, 379, 386.

In January 2015, Linda finished her cardiac rehabilitation and returned to working forty hours per week. R. 308. She denied chest pain and shortness of breath. *Id.* Her mental and physical examinations were normal, including good concentration; no loss of strength, stability,

or sensation; full range of motion; no edema; and normal gait and station. R. 287, 310. Her

diabetes and sleep apnea were not controlled, but she was "doing well using [the CPAP]

machine." *Id.* In March, Linda underwent a percutaneous transluminal coronary angioplasty

("PTCA"). *See* R. 453. She reported balance problems, stress from being laid off, and chest

pressure when she was upset. R. 346; *see* R. 103. She was "convinced" these symptoms were

stress-related, as they were "not the same as" the exertional symptoms she experienced before

the stents were placed. R. 346 (emphasis omitted). Her mental and physical examinations were

normal. R. 348.

In July, Linda reported "spells of being fluid overloaded" in her hands and feet and

feeling "some increased dyspnea" during these episodes. R. 476. Her mental and physical

examinations were normal except for mild puffiness in her feet and a heart murmur "intensity

grade I/VI." R. 477. In August, she established primary care with Babita Patel, M.D. R. 453. She

reported feeling much better after her catheterization procedure the previous March. R. 447, 453.

Dr. Patel noted that Linda appeared depressed and had a history of stroke with left-sided deficit,

but her mental and physical examinations were otherwise normal. R. 450–51, 456. In November,

Linda reported "[i]nfrequent feelings of dyspnea" that resolved with medication and "some mild

residual left-side weakness" that caused "discomfort" in her left leg "if she walk[ed] more than a

normal amount." R. 479. She could perform all normal activities of daily living without dyspnea.

*Id.* Her mental and physical examinations were normal. R. 480. A stress test in December

showed normal myocardial perfusion imaging and normal left ventricular ejection fraction. R.

545.

In the fall of 2016, Linda established care with Michael Kyles, M.D., for knee pain. In

October her left leg buckled, and she fell and sprained her right knee. R. 501, 503. An X-ray

showed no fracture or effusion, and she had a stable knee, but "mild" limp secondary to pain. R.

504. In November, Dr. Kyles noted that Linda "no doubt ha[d] impaired gait pattern related to

previous left sided stroke residue" and she had some right knee tenderness, but it was "grossly

stable" with full active range of motion, "minimal" tenderness, and no effusion. R. 501. In

December, Linda reported left knee pain and her leg giving out. R. 497. Dr. Kyles noted that she

had an abnormal gait, limited flexion, lower extremity muscle weakness and decreased muscle

tone, swelling, and moderate effusion in her left knee. R. 498, 99 ("Unable to walk four weight

bearing steps. Ability to climb on exam table abnormal."). An X-ray showed "minimal

degenerative changes" in the left knee, but no fracture. R. 499.

In February 2017, Linda was admitted to the hospital for dyspnea, tachycardia, and

abnormal troponin levels. R. 523, 530. She was diagnosed with an acute non-ST-elevation

myocardial infarction (heart attack) and admitted to the intensive care unit. R. 520. A chest X-ray

showed a mildly enlarged heart, but normal pulmonary vascularity. R. 539. Her EKG showed

severe concentric left ventricular hypertrophy and trace or mild mitral valve and tricuspid

regurgitation. R. 540–41.

2.    *Medical-Source Opinions*

On October 10, 2015, Linda saw Michael Quinn, D.O., for a consultative physical

examination. R. 463–68. She reported that she had had a stroke several years earlier, but was

able to return to work after twelve weeks with flexible hours and doing some work from home.

R. 463. She also had a heart attack in 2014 and returned to working full time until April 2015. R.

463–64. "She was unable to adjust her hours and was expected to work a full workweek and

could not work from home." R. 464. She stopped working "secondary to fatigue and also some

deficits in range of motion and strength of her left upper and lower extremities." *Id.* ("She states

8

'I cannot make it through an 8-hour workday.'"). She reported frequent fatigue, feeling "short of breath when she is really fatigued," occasional left-leg weakness and instability, "bad" balance, "ongoing difficulties at times with swallowing," and "some chest tightness, [but] only with anxiety." *Id.* She used "a cane or a walker" to help her walk "on a bad day." R. 467–68. Linda's examination was remarkable for "a 3 out of 6 systolic ejection murmur," trace edema in her lower extremities, reduced range of motion in her left shoulder and left hip, a gait that was a "bit slow and antalgic on the left," and slightly decreased strength (4+/5) in her left extremities. R. 465–66. "She was unable to walk on her toes or heels secondary to balance issues and concerns for falling." R. 466. Based on that day's examination, Dr. Quinn opined that Linda could stand and walk for fewer than two hours in an eight-hour workday "secondary to balance issues," "left lower extremity weakness[,] and an antalgic gait on the left from" the prior stroke; she could sit for "4 to 6 hours as long as she had appropriate breaks to move around for comfort"; and she could bend, stoop, crouch, and squat "only a minimum amount secondary to left lower extremity weakness and range of motion issues" related to the stroke. R. 467. Linda could occasionally lift twenty pounds and carry fifteen pounds and frequently lift and carry five pounds with her right arm. *Id.* She could occasionally lift ten pounds and carry five pounds with the left arm, but she could not lift any amount of weight on a "frequent" basis with that arm "secondary to the sequalae" of her stroke. *Id.* She was restricted to "only a minimum amount" of reaching, handling, grasping, and fingering with the left upper extremity for the same reasons. *Id.*

Also in October 2015, on review for the state agency, R.S. Kadian, M.D., opined that Linda could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; she could stand/walk for six hours and sit for more than six hours; she could frequently balance and stoop; she could occasionally kneel, crouch, crawl, and climb ramps and stairs; and she

could never climb ladders, ropes, or scaffolds because of "[r]esidual weakness and cardiac conditions." R. 138–39. Linda had no manipulative limitations, but she should avoid "concentrated" exposure to hazards because of her "[r]esidual weakness and occasional imbalance." R. 139–40. That December, William Rutherford, M.D., affirmed Dr. Kadian's opinion of Linda's physical limitations. R. 150–51.

In May 2016, Robin Harmer, FNP-C, completed a cardiac RFC questionnaire. R. 487–91. Linda had Class II to III dyspnea on exertion with symptoms of chest pain, shortness of breath, fatigue, and weakness, but no anginal pain. R. 487. Her symptoms caused "marked limitation" on her physical activity even though she was "comfortable at rest." *Id.* (emphasis omitted). Linda could not "tolerate a high stress situation," and she could work a "low stress job . . . only for short periods of time because she fatigue[d] easily due to her stroke." R. 488. Her cardiac symptoms would occasionally interfere with attention and concentration needed to perform simple tasks. *Id.* She could walk one-quarter of a city block without rest or severe pain, stand or walk fewer than two hours, and sit for about two to four hours in an eight-hour day. R. 489. Linda would require a job permitting her to shift positions at will and allowing unscheduled breaks every hour for "variable" amounts of time. *Id.* She had to elevate her legs to waist height four hours during an eight-hour sedentary workday. *Id.* Linda could occasionally lift and carry less than ten pounds; occasionally twist and stoop; rarely crouch, squat, and climb stairs; and never climb ladders. R. 490. Linda had to avoid concentrated exposure to extreme cold and heat, high humidity, perfumes, and dusts, and she had to avoid all exposure to cigarette smoke, soldering fluxes, solvents, cleaners, chemicals, and fumes, odors, or gases. *Id.* Linda would have good and bad days and would miss more than four days of work per month. R. 491. Her symptoms and limitations had existed since 2013. *Id.*

3.     *Linda's Testimony*

In June 2017, Linda testified that she had "trouble with [her] left shoulder," and she experienced left-sided numbness and swelling in her legs from sitting. R. 106, 108. She also had balance problems. R. 107; *see also* R. 111 (testifying that she had difficulty walking on uneven surfaces). The heart attacks and stroke affected her speech and memory. R. 107, 112. She could no longer do yard work, cross stitch, or crochet, and she was limited in her abilities to cook and do laundry. R. 107, 110–11. Her heart problems caused weakness, and she was told to avoid stress and to elevate her legs for twelve hours a day. R. 109–10.

Linda testified that transcription work was "very fast paced" and took "a lot of focus." R. 105, 108. Her stroke and first heart attack affected her typing ability, and she began making mistakes. *Id.*; *see also* R. 245 (noting that her typing line count decreased and she was unable to sit and type for eight hours). She was able to keep working until April 2015 because her employer let her set her own hours, take breaks as needed, and work from home. R. 104, 105–06; *see also* R. 245. She stopped working because her department closed and she was laid off. R. 103. After she was laid off, Linda applied for and received unemployment benefits. *Id.* She also applied for jobs, R. 104, but was unable to find an employer willing to give her the same accommodations as her previous employer, R. 108–09.

B.     *The ALJ's Decision*

ALJ Robinson considered this evidence throughout her written decision. At step two, she found that Linda's hyperlipidemia, hypertension, CAD, history of stroke, diabetes, and obesity were "severe" medical impairments. R. 82. She noted that after Linda's second heart attack in February 2017, there was "no evidence of any follow up care between th[at] event and the [administrative] hearing held four months later, and there [was] no indication that this particular

cardiac event . . . continued to affect her functioning or exacerbate[d] any limitations related to

her other impairments." *Id.* All other impairments, including Linda's sleep apnea, knee pain, and

left shoulder rotator cuff syndrome were "acute, with no significant long-term effect on [Linda's]

functioning and no indication of a need for ongoing treatment." *Id.* Linda's impairments did not

meet or equal any relevant Listing. R. 83 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 4.04, 9.00,

11.04).

Turning to the RFC assessment, ALJ Robinson briefly summarized Linda's testimony

that she had "very little activity tolerance," suffered from fatigue, "poor balance, poor memory,

and generalized weakness," "still experience[d] residual effects of the stroke, with numbness

when sitting, swelling in her legs, and numbness in her left arm," and could not "use her hands

for activities such as crocheting or typing." R. 84. She found that Linda's "medically

determinable impairments could reasonably be expected to cause [her] alleged symptoms," but

her "statements concerning the intensity, persistence and limiting effects of these symptoms

[were] not entirely consistent with the medical evidence and other evidence in the record for the

reasons explained in [the ALJ's] decision." R. 84. ALJ Robinson first noted that Linda's

acceptance of unemployment benefits showed she "was actively applying for work, claimed to

be available for work, and held herself out to another agency as able and willing to work," which

was "inconsistent with allegations of an inability to work full-time, and show[ed] that [Linda's]

symptoms [were] not as severe as her allegations would indicate." *Id.* She then noted that

Linda's "severe impairments [were] present since well before [her] alleged onset date" in April

2015, and her impairments "caused minimal persistent symptoms" and were "regarded as

controlled." R. 85 (citing R. 446–61, 472–84). After her alleged onset date, Linda reported

feeling much better and her physical examinations were generally normal except for a heart

murmur and mild puffiness in her feet. *Id.* (citing R. 446–61, 472–84). After August 2015, Linda

did not require "any significant treatment for her severe impairments," and, aside from "a brief

note of an impaired gait related to stroke residuals" in November 2016, her providers did not

note any other chronic difficulties. *Id.* (citing R. 496–516). Linda's myocardial perfusion

imaging in December 2015 and EKG in February 2017 indicated normal cardiac functioning. *Id.*

(citing R. 517–45). ALJ Robinson ultimately found that Linda's "impairments [had] largely been

controlled by conservative measures, with some residual effects of her stroke which limit her to

sedentary work," R. 86, plus "limited postural activity and no exposure to irritants" or

environmental conditions that could exacerbate her fatigue and further reduce her "low

exertional tolerance," R. 85. "Given her overall objective presentation, however, there [was] no

reason to limit her manipulative abilities." *Id.*

ALJ Robinson gave Dr. Quinn's medical opinion "little" weight because it was "grossly

inconsistent with the evidence of record and Dr. Quinn's own examination report, wherein

[Linda's] objective presentation was notable only for trace edema in the legs, a slow gait, and

limited forward elevation of the left shoulder." R. 86. The longitudinal medical record did not

show "dysphagia and chronic limitations in use of her left-sided extremities." R. 85 (citing R.

285–368, 472–84, 492–95). ALJ Robinson also gave NP Harmer's opinion "little" weight

because NP Harmer was not an acceptable medical source and the "extreme limitations" she

identified were "not supported by the evidence of record." R. 86. Finally, she gave the DDS

medical reviewers' opinions "partial" weight because they were "somewhat consistent with the

evidence," but the hearing-level record contained "sufficient evidence to support" additional

standing and walking limitations consistent with less-demanding sedentary work. *Id.*

C.      *Analysis*

Linda argues that ALJ's Robinson's RFC finding failed to account for Linda's alleged "inability to finger" on a "constant[]" basis, her residual "left sided weakness," and her purportedly "limited ability" to maintain concentration, persistence, and pace. Pl.'s Br. 4; *see id.* at 4–7, 8–9, 9–11. She also argues that ALJ Robinson erred in discounting Dr. Quinn's and NP Harmer's opinions indicating that Linda had such limitations. *See id.* at 4–8, 9–10, 11–14.

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and related symptoms.[4] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it should reflect any credibly established "functional limitations or restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). The ALJ has broad (but not unbounded) discretion to determine whether an alleged functional limitation is supported by or consistent with the medical and other relevant evidence in the claimant's record. *See Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear that she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and that she built an "accurate and logical

---

[4] "Symptoms" are the claimant's own description of her medical impairment. 20 C.F.R. § 404.1502(n).

bridge from that evidence to [her] conclusion," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir.

2018) (internal quotation marks and brackets omitted).

The regulations set out a two-step process for ALJs to evaluate symptoms as part of the

RFC assessment. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for

objective medical evidence showing a condition that could reasonably produce the alleged

symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ

must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit [her] ability," *id.*, to work on a regular and continuing

basis, *see Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL

1119029, at *4 (Mar. 16, 2016). "The second determination requires the ALJ to assess the

credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858

F.3d at 866, based on all the relevant evidence in the record. 20 C.F.R. §§ 404.1524a, 404.1526a,

404.1529(c). A reviewing court will uphold the ALJ's credibility determination if her articulated

rationale is legally adequate and supported by substantial evidence in the record.[5] *See Bishop v.

Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d

1007, 1011 (4th Cir. 1997)).

ALJ Robinson considered Linda's symptoms and assessed her RFC under these

standards. The ALJ rejected any manipulative limitations because Linda's "overall objective

presentation" did not support a "reason to limit her manipulative abilities." R. 85. Although ALJ

---

[5] For example, the ALJ cannot reject the claimant's statements about the intensity, persistence, or
functional effects of her "pain or other symptoms . . . solely because the available objective medical
evidence does not substantiate [those] statements." 20 C.F.R. § 404.1529(c)(2). The ALJ must give
specific, legally adequate reasons, supported by "references to the evidence" for the weight assigned to
the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21,
2013), and, when necessary, she should "explain how [s]he decided which of [those] statements to believe
and which to discredit." *Mascio*, 780 F.3d at 640. *See also Bishop*, 583 F. App'x at 68.

Robinson did not explain what she meant by "overall objective presentation," a fair reading of

her decision as a whole  indicates that she was referring to Linda's consistently normal

examination findings of full range of motion, normal gait, and no loss of strength, stability, or

sensation in her extremities. R. 82–85; R. 189, 291, 297, 306, 310, 319, 323, 348, 358, 410, 450,

456, 477, 480, 495; *see Dillon v. Berryhill*, No. 4:16cv42, 2018 WL 1309733, at *2 (W.D. Va.

Mar. 13, 2018). Linda occasionally demonstrated some reduced strength or "very mild residual

left-sided weakness," R. 300–02, 498–99, but ALJ Robinson adequately addressed the

conflicting evidence and provided a reasonable explanation for the weight she assigned the

evidence and why she credited the findings indicating Linda was not as functionally limited as

she alleged. The Court's role here is "to determine whether the ALJ's decision is supported as a

matter of fact and law." *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). It "cannot

simply look at the same evidence and reverse the ALJ on the basis that it could have reached a

different result." *Carr v. Berryhill*, No. 6:16cv10, 2017 WL 4127662, at *5 (W.D. Va. Sept. 18,

2017). The many normal physical examination findings and the numerous instances where Linda

did not report any symptoms provide substantial evidence for ALJ Robinson's decision not to

include any manipulative limitations in Linda's RFC. *See Lloyd S.*, No. 4:17cv26, 2018 WL

3912946, at *5, *11 & n.7 (W.D. Va. July 20, 2018) (affirming ALJ's conclusion that normal

findings on physical examinations did not support claimant's report of manipulative limitations);

*Fluellen v. Colvin*, No. 4:14cv30, 2015 WL 2238997, at *4 (W.D. Va. May 12, 2015) (affirming

ALJ's adverse credibility determination where claimant repeatedly either failed to report or

expressly denied the symptoms and limitations she described in her testimony).

      Second, ALJ Robinson offered legally adequate reasons to discount Linda's other

statements. The ALJ found that Linda's statements were not entirely credible because (1) she had

mostly normal physical examinations; (2) she received conservative treatment for conditions that

had been present since before her alleged onset date and were controlled with minimally

persistent symptoms; and (3) she sought unemployment benefits, which was at odds with her

statements that she was totally disabled. R. 84–86 (citing R. 285–344, 446–61, 472–84, 496–

516). Substantial evidence supports the ALJ's determination that Linda had mostly normal

physical examinations. R. 189, 291, 297, 306, 310, 319, 323, 348, 358, 410, 450, 456, 477, 480,

495. An ALJ cannot reject a claimant's subjective description of her symptoms solely on the

ground that it is not consistent with the objective medical evidence. 20 C.F.R. § 404.1529(c)(2);

*see also Lewis*, 858 F.3d at 866; *Hines*, 453 F.3d at 56. Linda's normal physical examination

findings, however, were not the only reason why ALJ Robinson discounted her statements. ALJ

Robinson also reasoned that Linda had received conservative treatment and her conditions were

controlled with minimally persistent symptoms. R. 85. Substantial evidence supports this

determination. *See* R. 189, 291, 297, 306, 310, 319, 323, 348, 358, 410, 450, 456, 477, 480, 495

(noting normal physical examinations); R. 545 (normal stress test); R. 456 (noting her conditions

were "stable"). Aside from some knee problems, R. 495–99, 501–03, Linda did not receive any

significant treatment for her severe impairments after August 2015 and she did not report any

significant symptoms or limitations to her providers, *see Fluellen*, 2015 WL 2238997, at *4 (.

Finally, ALJ Robinson noted that Linda initially applied for, and received, unemployment

benefits. R. 84. ALJ Robinson found this was inconsistent with Linda's statements that she was

totally disabled because at the same time Linda "claimed to be available for work, and held

herself out to another agency as able and willing to work during the adjudicative period." *Id.*

Substantial evidence supports ALJ Robinson's determination because Linda admitted to

receiving unemployment benefits and applying for jobs soon after her alleged onset date. R. 103–

04. Standing alone, each of the three reasons ALJ Robinson offered to support her determination of Linda's credibility might be inadequate, but together they provide substantial evidence to support the determination that Linda's impairments were not as severe as she alleged. *See Dibona v. Berryhill*, No. 5:17cv206, 2018 WL 4664126, at *5 (E.D.N.C. Sept. 28, 2018) ("Taken together, the extensive documentation considered by the ALJ provides substantial evidence for finding plaintiff's testimony not entirely credible concerning the intensity, persistence, and limiting effects of [his] symptoms.").

Linda also argues that ALJ Robinson erred in discounting Dr. Quinn's medical opinion and NP Harmer's RFC assessment. "Medical opinions" are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including her symptoms, prognosis, functional limitations, and remaining abilities. 20 C.F.R. § 404.1527(a)(1). The ALJ must adequately explain the weight afforded to every medical opinion in the record, taking into account factors such as the nature and extent of the source's treatment relationship with the claimant; how well the source explained or supported the opinion; the opinion's consistency with the record as a whole; and whether the opinion pertains to the source's area of specialty. *Id.* § 404.1527(c). Courts "must defer to the ALJ's assignments of weight" to differing medical opinions "unless they are not supported by substantial evidence," *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015), or they were reached by means of an improper standard or misapplication of the law, *see Coffman*, 829 F.2d at 517.

Contrary to Linda's argument, ALJ Robinson did not "reject" NP Harmer's and Dr. Quinn's opinions. *See* Pl.'s Br. 11–14. Instead, she weighed the opinions and afforded them both "little" weight. R. 85–86. Substantial evidence supports that determination. ALJ Robinson

discounted Dr. Quinn's opinion because "dysphagia and chronic limitations in [the] use of [Linda's] left-sided extremities [were] not seen throughout the record" and his opinion was "grossly inconsistent with the evidence of record and [his] own examination report." R. 84–85. Although Linda occasionally exhibited some reduced strength or "very mild residual left-sided weakness," R. 300–02, 498–99, she had mostly normal physical examinations including full range of motion, normal gait, and no loss of strength, stability, or sensation in her extremities, R. 189, 291, 297, 306, 310, 319, 323, 348, 358, 410, 450, 456, 477, 480, 495. Dr. Quinn's examination revealed only slightly reduced left-sided strength and range of motion, R. 466, which ALJ Robinson could reasonably find was inconsistent with the extreme standing, walking, lifting, and carrying limitations he identified. R. 467. Thus, ALJ Robinson's conclusion that Dr. Quinn's opinion was inconsistent with the record as well as his own examination findings is supported by substantial evidence. Linda did not allege any work-related functional limitations related to her occasional dysphagia, or difficulty swallowing. R. 331, 464; *see* SSR 96-8p, 1996 WL 374184, at *3.

ALJ Robinson also gave "little" weight to NP Harmer's opinion because the "extreme limitations [were] not supported by the evidence of record, and Ms. Harmer [was] not an acceptable medical source." R. 86. Nurse practitioners are not "acceptable medical source[s]," but their opinions "are important and should be evaluated on key issues such as impairment severity and functional affects, along with other evidence in the file." SSR 06-3p, 2006 WL 2329939, at *2–3 (Aug. 9, 2006); *see also* 20 C.F.R. § 404.1513(d). ALJ Robinson was within her discretion to determine that NP Harmer's opinion was inconsistent with the medical evidence and, therefore, her opinion should be afforded only "little" weight. She determined that NP Harmer's assessment of Linda's limitations in standing, walking, lifting, and carrying were "not

supported by the evidence of record." R. 86. The ALJ's decision is reasonable because the

records show that Linda only occasionally exhibited some reduced strength or weakness, R. 300–

02, 498–99, but she consistently had normal physical examinations with full range of motion,

normal gait, and normal strength, stability, and sensation in her extremities, R. 189, 291, 297,

306, 310, 319, 323, 348, 358, 410, 450, 456, 477, 480, 495. "Accordingly, the Court finds that

the ALJ properly considered [NP Harmer's and Dr. Quinn's] opinions and provided appropriate

explanation[s] regarding why [s]he accorded [their] opinions little weight." *El v. Colvin*, No.

3:12cv637, 2013 WL 3446654, at *5 (W.D.N.C. July 9, 2013).

Additionally, Linda asserts that the ALJ erred by not including in her RFC a limitation in

Linda's ability to concentrate, persist, and maintain pace. As support for this limitation, Linda

identifies only NP Harmer's opinion, *see* Pl.'s Br. 3, 9–11, 11–13, which I have found the ALJ

reasonably determined deserved little weight. Moreover, the few medical notes in the record that

assessed Linda's mental status documented normal findings. *See* R. 297, 321, 356. Accordingly,

substantial evidence supports the ALJ's decision not to include in Linda's RFC a limitation in

her ability to concentrate, persist, and maintain pace.

ALJ Robinson adequately explained the rationale for her RFC determination that Linda

did not have manipulative limitations and could perform a limited range of sedentary work. She

also gave legally sufficient reasons for the weight she gave to the medical and other opinions in

the record. Accordingly, substantial evidence supports the ALJ's RFC determination.

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**DENY** Linda's Motion for Summary Judgment, ECF No. 14, **GRANT** the Commissioner's

Motion for Summary Judgment, ECF No. 16, **AFFIRM** the Commissioner's final decision, and

**DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: April 27, 2020

Joel C. Hoppe
United States Magistrate Judge

21